CARMEN REGINO BORGES, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE GUAYAMA, recurrido.

*Número:* G-64-2      *Resuelto:* 28 de octubre de 1964

114

*José J. Rivera Inchausty,* abogado del recurrente. El Registrador recurrido compareció por escrito.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

## I.

El recurrente se encuentra en la siguiente situación: el Estado, mediante una oficina pública le exige hacer determinada cosa y mediante otra se lo prohibe. Ha recurrido a nosotros, como árbitros del sistema público-administrativo, para que resolvamos el dilema en que se encuentra. Las dos oficinas públicas antes aludidas son la Junta de Planificación y el Registro de la Propiedad. El problema llega a nosotros como un aparente conflicto entre dos disposiciones legales: un reglamento aprobado bajo autoridad de ley y otra ley.

Adelantemos lo siguiente. Si lo que desea hacer el recurrente no está prohibido por la ley, ni es contrario a la moral o al orden público, lo puede hacer. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372; *Castle Enterprises Inc.* v. *Registrador,* 87 D.P.R. 775 (1963). Naturalmente, si lo que el recurrente desea hacer está prohibido, y si la prohibición es constitucionalmente válida, no lo puede hacer. Si es cierto que una disposición legal (un reglamento de Planificación hecho

bajo autoridad de ley) lo ordena y otra (un artículo del Código Civil) lo prohibe, entonces estaríamos ante un conflicto entre dos disposiciones legales internas y en ese caso resolveríamos el conflicto en la forma más realista y dándole vigencia a, o creando, la norma socialmente más util.

El peticionario y su esposa otorgaron una escritura pública mediante la cual segregaron 4 solares de una finca de su propiedad. Los solares segregados se identificaron en la escritura como sigue: Solar Núm. 1, de 1067.50 metros cuadrados, Solar Núm. 2, de 1225 metros cuadrados, Solar Núm. 3, de 900 metros cuadrados y Solar Núm. 4, de 719.25 metros cuadrados. Luego de las segregaciones mencionadas quedó un remanente de 6.5532 cuerdas. Al aprobar la mencionada segregación, la Junta de Planificación de Puerto Rico, en su "Dispensa de Lotificación Rural Condicionada" determinó lo siguiente:

"Debido a que el Remanente carece de acceso legal a una vía pública es condición *sine qua non* para la inscripción de esta lotificación que se establezca mediante escritura pública una servidumbre de paso de 10.00 metros de ancho."

En cumplimiento de la obligación impuéstale el peticionario, al elevar a acto público la mencionada segregación—como viene obligado a hacerlo—otorgó una escritura de segregación y constitución de servidumbre, mediante la cual constituyó una servidumbre de paso sobre los solares números tres y cuatro en favor del predio remanente, que es el predio que quedaba enclavado. Se describen detalladamente en la escritura el predio dominante y los dos predios sirvientes. Se hace constar en la misma que "se constituye la servidumbre porque ha sido requerida por la Junta de Planificación de Puerto Rico como condición *sine qua non* para la inscripción de la lotificación y porque conviene al mejoramiento de los predios y al orden público, además de otras buenas y valiosas causas."

Al ser presentada la escritura en el Registro de la Propiedad de Puerto Rico, Sección de Guayama,(¹) el Registrador la devolvió sin inscribir con una nota que dice así:

"Devuelto el presente documento, con vista de los dos complementarios de la Junta de Planificación que se acompañan, sin practicar las operaciones solicitadas por el fundamento de que la segregación de los 4 solares para inscribirlos a nombre de los propios titulares don Carmen Regino Borges y doña Aida Bonilla está supeditada, según la condición impuesta por la Junta de Planificación, a que sobre dichos predios segregados se establezca una servidumbre de paso a favor del remanente de la finca principal para darle acceso a vía pública, condición que no puede cumplirse ya que nadie puede constituir servidumbre sobre fundo propio con arreglo a lo dispuesto en el artículo 465 del Código Civil vigente cuando ambos. predios, dominante y sirviente, pertenecen al mismo titular."

La posición del señor Registrador, presentada en un memorandum escrito con ejemplar pulcritud, mesura y propiedad, consiste, en esencia y como la nota antes transcrita indica, en que el Art. 465 del Código Civil, 31 L.P.R.A. sec. 1631, impide la inscripción solicitada. Dice textualmente dicho artículo:

"La servidumbre es un gravamen impuesto sobre un inmueble en beneficio de otro perteneciente a distinto dueño. El inmueble a cuyo favor está constituida la servidumbre se llama predio dominante; el que la sufre, predio sirviente."

Opina el Registrador que para hacer lo que el recurrente desea hacer, sería necesario enmendar el citado Art. 465 del Código Civil de manera que permitiese las servidumbres de propiedad, o sea, las servidumbres sobre fundo propio en beneficio de otro fundo también propio. Citando de *Colón* v. *San Patricio Corporation*, 81 D.P.R. 242 (1959) nos recuerda el Registrador que el Art. 733 del Código Civil de Suiza permite a los propietarios establecer servidumbres sobre un

---

(¹) Para la presente organización del Registro de la Propiedad véase la Ley Núm. 3 de 2 de septiembre 1955, 30 L.P.R.A. secs. 1748 y ss.

fundo de su propiedad a favor de otro inmueble también de su propiedad. Reconoce, parece, que las reglas *servitus in faciendo consistere nequit* y *nemini res sua servit* se encuentran hoy tambaleantes. Si dichas reglas son sustituidas o modificadas, acepta, "no sería la primera vez que los principios individualistas de la legislación romana tendrían que ceder ante el derecho del futuro." Además opina el señor Registrador que "ante el desarrollo de nuestras urbanizaciones . . . es posible que así suceda y *hasta es deseable y plausible que así se haga*, trayendo a nuestro derecho positivo las enmiendas de rigor más prácticas al desarrollo hasta ahora creciente de nuestras urbanizaciones . . ." (Subrayado nuestro.)

Sin embargo, cree el Registrador que es preferible que esos cambios se hagan mediante legislación y no por interpretación judicial. Al efecto nos dice:

"Decimos lo anterior sin perder de vista que es cierto que son los tribunales los llamados a oficiar las aguas bautismales a las criaturas jurídicas de nueva creación con arreglo a la doctrina condensada en la regla del 'numerus apertus', pero para evitación de las actuales vacilaciones de los Registradores de la Propiedad que califican con criterio dispar y también de la jurisprudencia ante las nuevas figuras ideadas por la inventiva en la contratación, es preferible ante todo que los cuerpos legislativos intervengan directamente fijando las pautas en el derecho positivo."

La posición del recurrente: Éste, en un alegato realista y de enfoque sociológico, nos argumenta que la Junta de Planificación, organismo creado por ley para establecer la política pública en materia de planificación, exige en este caso la constitución de la mencionada servidumbre de paso como condición para permitir la segregación de los cuatro solares mencionados. Esta condición, nos dice, tiene fuerza de ley, fue cumplida por el peticionario y la misma reviste interés público.

Es hora ya, nos dice el recurrente, de que se admita en nuestro derecho que una servidumbre predial puede estable-

cerse a favor de un predio propio puesto que la regla en contrario resulta hoy inconveniente. Argumenta que la vieja legislación romana tiene que ceder ante el derecho de nuestra época. Sostiene que el citado Art. 465 del Código Civil no prohibe la creación de otras figuras jurídicas distintas a las servidumbres allí mencionadas. Cita el Art. 2 de la Ley Hipotecaria y el 27 del Reglamento Hipotecario mediante los cuales son inscribibles todos los derechos reales, sin estar limitado su número a aquéllos mencionados en el Código Civil.

En la alternativa, argumenta el recurrente, la condición impuesta por la Junta de Planificación es una servidumbre legal, impuesta por la ley, y por lo tanto es inscribible. También en la alternativa argumenta que la servidumbre de paso que aquí nos ocupa no constituye un acto nulo sino que a lo sumo permanece pasivo y cobrará vigencia cuando los distintos solares afectados vengan a manos de otros dueños y que por lo tanto procede practicar las operaciones registrales solicitadas.

Concluye el recurrente expresando lo siguiente:

"Las necesidades de nuestro desarrollo urbano y rural, regulado por el Estado para garantizar el bien común, exigen que se admitan a nuestro Derecho figuras jurídicas nuevas y variaciones de las ya establecidas y organizadas por nuestro código civil, ya que esto no contraviene la ley sino que adapta sus disposiciones a las nuevas realidades de la vida moderna mediante la interpretación del espiritu de las leyes que deberán ser tan flexibles como la necesidad de nuestro tiempo así lo requiera. El Código Civil no es un cuerpo de derecho inflexible, rígido y cerrado, sino que por el contrario admite que se le interprete para servir a los pueblos donde está vigente, conforme a las vivas realidades de la época; de otro modo muchas de sus disposiciones pasarían a ser letra muerta en vez de ser vigorizadas por la sabiduría de los Tribunales en su ingente labor interpretativa que denominamos jurisprudencia."

## II.

No estamos ante el caso de unas cláusulas restrictivas, conocidas en derecho anglosajón como "servidumbres en equidad," pactadas por los urbanizadores de un predio dentro de un plan general de mejoras para el desarrollo de una urbanización residencial, como lo estuvimos en *Colón* v. *San Patricio Corporation,* supra. Allí expresamos, a la pág. 251, que dentro de la sistemática del Código Civil resulta muy difícil utilizar la figura jurídica de la servidumbre predial para imponer restricciones *privadas* sobre terrenos que van a ser urbanizados y recurrimos una vez más al concepto de "servidumbre en equidad" para legitimar dentro de nuestro derecho civil un sistema reconocidamente deseable de urbanizar y mejorar predios. Nos referimos al sistema o práctica de pactar cláusulas restrictivas cuyo propósito es crear un vecindario residencial agradable, estético y sano. (²)

Ya desde *Glinés* v. *Matta,* 19 D.P.R. 409 (1913) habíamos incorporado a nuestro derecho el concepto de servidumbre en equidad, paso que hemos confirmado repetidas veces. (³)

En *Colón* v. *San Patricio Corporation,* supra, expresamos, a la pág. 252, lo siguiente:

---

(²) Sobre servidumbres en equidad puede verse Clark, *Covenants and Other Interests Which "Run With The Land"* (2 ed. 1947) 174–177; Maitland, *Equity* (2 ed. 1936) 162–167; Stone, *"The Equitable Rights and Liabilities of Strangers to a Contract"* (1918) 18 Colum. L. Rev. 291, 19 id. 177; Ames, *"Specific Performance Against Strangers to the Contract"* (1903) 17 Harv. L. Rev. 174, también en id. *Lectures on Legal History* (1913) 381; Pound, *"Progress of the Law-Equity"*, (1919) 33 Harv. L. Rev. 813–822; *In re Nisbet and Potts' Contract* (1905) 1 Ch. 391, (1906) 1 Ch. 386; Chafee, *"Equitable Servitudes on Chattels"* (1928) 41 Harv. L. Rev. 945.

(³) *Lawton* v. *Rodríguez Rivera,* 35 D.P.R. 487 (1926); *Macatee* v. *Biascoechea,* 37 D.P.R. 1 (1927); *Carrión* v. *Lawton,* 44 D.P.R. 463 (1933); *Fiol* v. *López de la Rosa,* 46 D.P.R. 749 (1934); *Santaella* v. *Purón,* 60 D.P.R. 552 (1942); *Baldrich* v. *Registrador,* 77 D.P.R. 739 (1954); *Pérez* v. *Pagán,* 79 D.P.R. 195 (1956); *Colón* v. *San Patricio Corporation,* 81 D.P.R. 242 (1959).

"Las necesidades prácticas que crean los recientes desarrollos urbanísticos han motivado ásperas críticas a las reglas de 'nemini res sua servit' y de 'servitus in faciendo consistere nequit' en muchos países de derecho civil, tales como Alemania, Bélgica y Suiza. [citas omitidas] Enneccerus, Kipp & Wolff reconocen que 'son muchas las razones en pro de la necesidad de la servidumbre de propietario,' precisamente cuando se trata de cargas de urbanización. [citas omitidas] La doctrina y la jurisprudencia en Bélgica también han luchado con los obstáculos jurídicos que existen para crear servidumbres verdaderamente positivas e imponer cargas de urbanización sobre un solo fundo. De Page nos dice que los intereses prácticos exigen que esas cargas de urbanización constituyan servidumbres de carácter real y analiza los medios que sirven para eludir en la práctica el rigor de la ley. Concluye que: 'La regla *servitus in faciendo consistere nequit* . . . se encuentra hoy día tambaleante. El día vendrá quizás en que se admitirá que una servidumbre consiste en hacer algo positivo, siempre que se trate de un acto que revista interés público. No sería la primera vez que los principios individualistas de la legislación romana tendrían que ceder ante el derecho del futuro.' [citas omitidas] Y el Código Civil suizo autoriza en su art. 733 a todo dueño a establecer una servidumbre sobre un fundo de su propiedad a favor de otro inmueble de su misma pertenencia. En la '*Exposición de Motivos*' se da la siguiente justificación: 'Esta institución puede ser de una gran utilidad. Basta pensar en la construcción de toda una urbanización sobre una finca que originalmente ha pertenecido a un solo dueño. *Éste puede crear desde el principio,* sobre todas las parcelas destinadas a ser vendidas más adelante, *las servidumbres apropiadas para la totalidad del proyecto de urbanización.'* " [citas omitidas] (Subrayado nuestro.)

Son esas buenas razones para, en el último tercio del siglo 20, impartirle flexibilidad y revitalizar un Código Civil redactado en el último tercio del siglo 19. Como dice Ihering en su monumental *Espíritu del Derecho Romano,* la adopción de instituciones jurídicas extrañas, más bien que cuestión de nacionalidad lo es de necesidad. Sin embargo, no hay que extremar la nota.

No es necesario en el caso de autos tomar del derecho anglosajón figura o institución jurídica alguna porque el Código Civil—que de todas maneras es una pieza maestra—contiene en su propio cuerpo las disposiciones exactas y precisas que gobiernan la situación que este caso plantea.

Antes de seguir adelante, y aunque no vamos a basar esta opinión en el citado Art. 465 del Código Civil (equivalente al 530 español) despejemos de una vez la situación señalando que los términos aparentemente absolutos de dicho artículo no son absolutos. Demostrémoslo: Dice dicho Art. 465, como vimos antes, que la servidumbre es un gravamen impuesto sobre un inmueble en beneficio de otro inmueble. Si las servidumbres cubiertas por el título VII del Libro II del Código Civil fuesen solamente esas, o sea, servidumbres impuestas sobre un inmueble en beneficio de otro inmueble, no sería posible, dentro de la sistemática del Código Civil, establecer servidumbres sobre un inmueble en beneficio de una persona. Sin embargo, esto es posible. Es posible porque a pesar de lo dicho en el Art. 645, el propio Código, en el Art. 466, dispone que también pueden establecerse servidumbres en provecho de una o más personas.

Critica Scaevola esa contradicción entre esos dos artículos[4] pero reconoce, como lo señalan otros tratadistas, el origen histórico del Art. 466 (equivalente al 531 español). Explican los civilistas españoles que dicho artículo no es de origen nacional español sino que llegó al Código español a través del Código francés de 1804. Las servidumbres a que hace referencia el Art. 466 son las servidumbres personales (así conocidas en el derecho romano) las cuales al ser objeto de codificación al redactarse el Código Civil francés no fueron llamadas de ese modo. A los legisladores de la revolución francesa les pareció inadmisible el término "servidumbres personales" por recordarles los tiempos ominosos anteriores

---

[4] 10 Código Civil (1895), pág. 80.

y de ahí la redacción de ese artículo. (⁵) Es conocido el influjo que el Código francés de 1804 ejerció sobre los códigos civiles posteriores. Muchos países inspiraron sus codificaciones en el modelo francés, reproduciendo su espíritu y líneas directrices. (⁶) Es tal vez por esta razón que el Tribunal Supremo de España ha considerado a las servidumbres personales como irregulares o anómalas y ha señalado que como el Código Civil Español no contiene normas acerca de esas servidumbres, habrán de regirse por el título de su constitución. (⁷)

■ Aclara considerablemente el pensamiento sobre todo esto si se tiene en mente que el Art. 465 se refiere a las servidumbres típicas y que otros artículos del Código, como el citado 466, se refieren a servidumbres atípicas. También son servidumbres de una naturaleza especial las servidumbres legales. (⁸) "Jus singulare" las llama Rocca-Juan. (⁹) Puede afirmarse, escribe Valverde, que "las servidumbres legales en el alcance y concepto con que actualmente se conciben no se conocieron en el derecho romano." (¹⁰) Utilizando un criterio tradicional o estricto puede decirse que éstas no cons-

(5) Puig Peña, *Derecho Civil*, Tomo III, Vol. 1, pág. 378; Scaevola, obra citada, pág. 143; De Diego, *Instituciones del Derecho Civil Español*, (1959), Tomo I, pág. 467.

(6) Así ocurrió, por ejemplo, en Holanda, Italia, Rumanía, Portugal, España, Suiza, Egipto, Luisiana, y en casi todos los países de la América del Sur y la América Central. Castán, *Derecho Civil Español, Común y Foral*, 9a. ed., 1955, Tomo I, Vol. 1, pág. 150; Scaevola, obra citada, pág. 143; Valverde, *Tratado de Derecho Civil Español*, 4ta. ed., Tomo I, pág. 59.

(7) Sentencias del Tribunal Supremo de España de 3 de mayo de 1906, de 5 de julio de 1918, de 4 de abril de 1921 y de 18 de diciembre de 1933, citadas en Rocca-Juan, *Las Servidumbres*, Art. 531, pág. 1.

(8) Manresa, *Comentarios al Código Civil Español*, 6ta. ed. (1951), Tomo IV, págs. 731 y ss.

(9) *Las Servidumbres* (1961), Tit. VII, Cap. II, pág. 2.

(10) *Tratado de Derecho Civil Español*, 4ta. ed., Tomo II, pág. 364.

tituyen propiamente verdaderas servidumbres.[11] Por esa razón es que al tratarse de las servidumbres legales no podemos aplicar *grosso modo* la doctrina y criterios elaborados en torno a las servidumbres tradicionales de abolengo romano. Más adelante señalamos que los tratadistas explican que el régimen de las servidumbres legales cae dentro del ámbito del derecho administrativo.

El Código Civil establece las servidumbres prediales en su Art. 465, las personales en sus Arts. 466 y 467 y así sucesivamente nos habla de las servidumbres continuas y discontinuas, aparentes y no aparentes, etc., en los Arts. 467 al 469, 31 L.P.R.A. secs. 1631–1635. En el Art. 472 que es el último de esa sección, denominada "Clases de Servidumbres", el Código expresa que "Las servidumbres se establecen por ley o por la voluntad de los propietarios. Aquéllas se llaman legales y éstas voluntarias." 31 L.P.R.A. sec. 1638. Es más adelante y en otro capítulo del Código en que éste vuelve a ocuparse de las servidumbres legales y allí contiene las siguientes tres disposiciones en su breve sección de "Disposiciones Generales" sobre las servidumbres legales (31 L.P.R.A. secs. 1701–1703):

"Las servidumbres impuestas por la ley tienen por objeto la utilidad pública o el interés de los particulares." Art. 485.

"Todo lo concerniente a las servidumbres establecidas para utilidad pública o comunal se regirá por las leyes y reglamentos especiales que las determinan, y en su defecto, por las disposiciones de la presente parte." Art. 486.

"Las servidumbres que impone la ley en interés de los particulares, o por causa de utilidad privada, se regirán por las disposiciones de la presente parte, sin perjuicio de lo que dis-

---

[11] Así, por ejemplo, lo expresa el Profesor Guaroa Velázquez. V. sus conferencias *Los Derechos Reales Principales*, 1937, mimeo. Universidad de Puerto Rico, pág. 224. V. también Puig Brutau, *Fundamentos de Derecho Civil*, (1953) Tomo III, págs. 392–393; y Sánchez Román, *Estudios de Derecho Civil*, 2da. ed. (1900), Tomo III, págs. 610–611; Valverde, obra citada, Tomo II, pág. 364.

pongan las leyes, reglamentos y ordenanzas generales o locales sobre policía urbana o rural.

"Estas servidumbres podrán ser modificadas por convenio de los interesados cuando no lo prohiba la ley ni resulte perjuicio a tercero." Art. 487.

Salta a la vista que en materia de servidumbres legales establecidas para utilidad pública, el Código Civil es supletorio (Art. 486) y que en cuanto a las servidumbres legales establecidas en interés de los particulares sus disposiciones rigen *sin perjuicio de lo que dispongan las leyes y reglamentos especiales* (Art. 487). Manresa, al comentar el Art. 550 español, equivalente al 486 nuestro, expresa:

"La aplicación del Derecho positivo a las servidumbres de esta clase ha de hacerse teniendo las *leyes y reglamentos especiales,* en cada servidumbre particular, *el carácter de derecho principal* o de primer grado, *y el presente título del Código el de derecho supletorio." Comentarios al Código Civil Español,* 6ta. ed., 1951, Tomo IV, pág. 736. (Subrayado nuestro.)

En su comentario a las servidumbres legales, Borrell y Soler lo expresa como sigue:

"De modo que para las servidumbres que atienden al interés público el derecho propio es el administrativo y el supletorio es el Código civil, y para las de interés privado el derecho propio es el Código, pero sin perjuicio de las disposiciones administrativas sobre policía urbana o rural. *Por lo tanto, las disposiciones administrativas son preferentes en ambos casos . . ." Derecho Civil Español,* (1955) Tomo II, pág. 476. (Subrayado nuestro.)

En el mismo sentido se expresan Puig Brutau, en su *Fundamentos de Derecho Civil,* (1953) Tomo III, pág. 419; y Scaevola, obra citada, pág. 362.

La distinción que hace el Código entre las servidumbres legales establecidas en interés público y las establecidas en interés de los particulares es un poco artificiosa y no podemos tomarla muy al pie de la letra. Algunos autores lo señalan. Borrell y Soler expresa que no siempre es fácil distinguir si una servidumbre es de utilidad pública o privada, porque

el interés de los particulares puede trascender al público. (¹²)
Si bien es cierto que el interés público es en unas más claro
que en otras, ambas clases de servidumbres están estableci-
das por la ley porque conviene al orden público que haya
derecho positivo sobre el particular. Manresa comenta como
sigue:

"En primer lugar, nada tan vago e indeterminado como la
distinción apriorística de lo público y de lo privado; la misma
jurisprudencia no siempre está clara para fijar distintivamente
el carácter público o privado de las contiendas acerca de las
servidumbres. Por otra parte, según advierte un comentarista
distinguidísimo del Código civil italiano el señor Ricci, al explicar
el concepto general de las servidumbres legales, 'aun cuando se
refieran éstas a la utilidad privada, sin embargo, están estable-
cidas siempre por una razón de interés general, toda vez que
el legislador ha experimentado la necesidad de limitar y ordenar
la libertad de los particulares, precisamente con el propósito de
garantir la libertad común, y conciliar por tal modo derechos e
intereses opuestos.' " (¹³)

Más adelante, en la misma página citada, Manresa, refi-
riéndose a la ordenación que hace el Código de las servidum-
bres legales, señala "el carácter realmente público, general,
del interés que exige su adecuada ordenación." El derecho
privado, aunque aparentemente trata del interés de los par-
ticulares, existe porque la experiencia ha demostrado que con-
viene para la vida en sociedad y para la paz en general
que las materias que comprende estén ordenadas de antemano
por normas coercitivas. Las leyes producen la libertad orde-
nada que es la única libertad real y posible en la sociedad
humana, pues lo contrario, la libertad absoluta de cada ser
humano, resultaría en la anarquía y en la negación de la
libertad misma de cada cual.

Hemos visto, pues, que las servidumbres legales se
rigen por sus leyes especiales. En el caso de las públicas, el

(¹²) Borrell y Soler, obra citada, Tomo II, pág. 476.
(¹³) Manresa, obra citada, Tomo IV, pág. 733.

Código es derecho supletorio y en el caso de las llamadas privadas, rige el Código pero solo en tanto en cuanto dicho cuerpo legal no esté en conflicto con las leyes y reglamentos especiales sobre la materia. Tienen precedencia dichas leyes y reglamentos especiales. Aun las llamadas servidumbres legales privadas tienen estrecha relación con el orden público. Habiendo examinado lo que dispone el derecho civil sobre las servidumbres legales precisa ahora que veamos lo que dispone el derecho administrativo sobre el asunto, derecho que, como hemos visto, en esta materia tiene precedencia al Código.

■ La Ley de Planificación y Presupuesto de Puerto Rico, Ley Núm. 213 de 12 de mayo de 1942, según enmendada, 23 L.P.R.A. secs. 1 y ss., establece en su artículo tercero que los poderes que la misma confiere se ejercerán con el propósito general de guiar el desarrollo de Puerto Rico de modo coordinado, adecuado y económico. El Art. 9 de dicha ley faculta a la Junta de Planificación para adoptar reglamentos sobre zonificación y otros extremos. Dichos reglamentos podrán aplicarse a áreas urbanas, a áreas que se vayan a urbanizar y también a áreas agrícolas y a las playas en las circunstancias que la ley determina. Más específicamente, su Art. 10, ordena a la Junta adoptar reglamentos para regir la lotificación de terrenos en Puerto Rico. Dichos reglamentos podrán exigir reservación de terreno para fines públicos. *Seashore Realty* v. *Junta*, 75 D.P.R. 142, 151 (1953); *Zayas* v. *Junta*, 69 D.P.R. 30, 37–38 (1948). Será deber de la Junta considerar, en relación con las subdivisiones de terrenos, que haya facilidades sociales y físicas adecuadas. 23 L.P.R.A. sec. 10. No tenemos duda de que un camino para dar acceso a terrenos, que con motivo de una lotificación de otro modo quedarían enclavados, es una facilidad física necesaria y de interés privado y público. Si la Junta tiene facultad, como la tiene, para exigir que se dediquen terrenos para calles y caminos

públicos también la tiene para exigir servidumbres para ese mismo fin. Quien puede lo más puede lo menos. Finalmente, para proveerle sanción a las disposiciones de la ley y de los reglamentos que bajo su autoridad se hagan sobre este particular, la ley dispone en su Art. 24 que no se hará ninguna lotificación de terrenos y no se aceptará para registrarlo ningún plano de lotificación que no cumpla con los reglamentos y que no haya sido aprobado por la Junta. Ese mismo artículo, *in fine*, dispone que "Carecerá de eficacia cualquier otorgamiento de escritura pública o contrato privado de lotificación si no ha sido sometida previamente dicha lotificación a la consideración de la Junta de Planificación de Puerto Rico y de haber sido aprobada por ésta, excepto en aquellos casos en que lo permita el Reglamento de Lotificación." 23 L.P.R.A. sec. 25.

En descargo de sus responsabilidades estatutarias la Junta ha aprobado reglamentos. Mediante ellos ha dispuesto que:

"Toda lotificación se hará en tal forma que cada solar y cada predio queden provistos de un acceso satisfactorio a una carretera, avenida o calle pública existente o cuya construcción esté planeada dentro del plan de la lotificación." 23 R.&R.P.R. sec. 10–154(a).

También ha dispuesto que "Se podrán requerir servidumbres . . . por los lindes, o a través de solares, cuando fueren necesarias para la extensión de servicios existentes o proyectados." 23 R.&R.P.R. sec. 10–305(b).

Es clara la necesidad y conveniencia de los objetivos que las citadas secciones tienen. Prácticamente todas las sociedades civilizadas han adoptado medidas de planificación y de urbanismo. Esas medidas significan, no hay duda, limitaciones al derecho de propiedad, pero producen mejores comunidades para la convivencia humana, y aun desde el punto de vista meramente económico, realzan el valor de los in-

muebles allí sitos al mejorar las poblaciones y lugares en donde se ponen en práctica dichas medidas.

En su excelente artículo "En Torno al Urbanismo. Política del Suelo y Registro de la Propiedad," 39 Revista Crítica de Derecho Inmobiliario 443 (1963), Fuentes Sánchez señala que es universal el complejo de problemas que plantea la inusita expansión de los centros urbanos. Cita estadísticas demográficas que indican que para el año 2,000 el 45% de los habitantes del globo vivirá en las ciudades. Señala que no son producto del azar ni mero mimetismo las coincidencias legislativas en los distintos países sobre planificación, expropiación forzosa, señalamiento de zonas verdes, etc. [14] Ante los problemas de intervención pública o administrativa que esos cambios hacen inevitable expresa Fuentes Sánchez a la pág. 452:

"Tenemos en nuestra técnica registral inmobiliaria experiencia suficiente; pero ¿estamos seguros de que ha de bastarnos, sin reajustes, para hacer frente a los problemas futuros? Parece indudable que no; y que debemos prepararnos para que, sin soluciones de continuidad, se obtengan las nuevas fórmulas."

Al final de su artículo el citado autor, que es un Registrador de la Propiedad en su patria, afirma:

"La estructura del Registro de la Propiedad solo debe ser rígida en sus principios fundamentales, pero ha de amoldarse a las situaciones y circunstancias en su funcionamiento. Los Juristas tienen, en la Política del Suelo, una noble tarea: servir, una vez más al desarrollo de la Comunidad."

Huelga insistir sobre esto pero por tener cierto interés, debido a su fuente, vamos a reproducir una página de Scaevola, publicada en 1895. Dice el distinguido civilista al escribir sobre las servidumbres legales:

"Dada la estructura del derecho de propiedad en nuestra época, el dueño puede gozar y disponer libremente de la cosa;

---

[14] Por ejemplo, la legislación moderna española sobre urbanismo es extensa y detallada.

.pero esta libertad ha de subordinarse a las restricciones que la ley, representando el interés público o privado, establece en pro de esos mismos intereses. La propiedad individual absoluta es imposible; el hombre, al vivir en sociedad, tiene que someterse a las condiciones que impongan los órganos representativos de aquélla .para regular las relaciones de los individuos en los varios órdenes humanos, que no pueden quedar por su naturaleza a la libre determinación personal.

"Esto sucede por excelencia en el orden económico; éste es el que rige y domina a los demás, porque el cumplimiento de cualquier fin humano exige necesariamente medios económicos o materiales, y de aquí el perfecto derecho de la sociedad o de sus órganos para intervenir en las relaciones dominicales, a fin de conseguir que todos los hombres, dentro de la forma que presenta ahora la propiedad, puedan normalmente gozar de ésta. La libertad económica absoluta es un absolutismo económico, porque, a semejanza del político, una persona es dueña, sin limitación, de una cosa (como el Rey lo era de la Nación), en detrimento del derecho de los demás." (15)

■ Fue en cumplimiento de las citadas disposiciones de la Ley de Planificación y de su Reglamento de Lotificación que la Junta le exigió al recurrente que estableciese mediante escritura pública una servidumbre de paso de diez metros de ancho sobre los solares Núms. 3 y 4 debido a que de no hacerse así el predio remanente hubiese quedado enclavado. A la inscripción de esa servidumbre es que el señor Registrador objetó. Como señalamos antes, su posición se basa en la aplicación estricta del Art. 465 del Código Civil. Si se tratase de una servidumbre típica, o sea, de una servidumbre de paso voluntaria, tendría razón el Registrador en vista del citado artículo. Pero como hemos visto, se trata de una llamada servidumbre legal, que no es otra cosa que una limitación al derecho de propiedad impuesta por el Estado en interés público. Se trata pues de una limitación compulsoria al derecho de propiedad—"servidumbres coactivas" las llama el nuevo Código Civil Italiano, Art. 1032—y el problema cae

---

(15) Obra citada, pág. 357.

dentro del ámbito del derecho público o administrativo, como hemos señalado y como también señalan los tratadistas.

La razón de la diferencia entre esos dos casos (la servidumbre voluntaria y la legal) es que no habría razón para que un propietario quisiese constituir una servidumbre de paso sobre su propio fundo pues es evidente que él podría pasar por su propio terreno cuantas veces quisiese. Por eso el Código no da margen, dentro de los términos del Art. 465, para que un propietario imponga una servidumbre sobre su propio fundo. Pero aquí se trata de un terreno que ha sido lotificado y del cual se han segregado una serie de solares, todo con aparente intención de enajenarlos. Es sabido que las lotificacciones y las segregaciones no se hacen por el gusto de hacerlas. Por eso tiene ingerencia el derecho público al exigir que esos solares y predios que eventualmente van a pasar a manos distintas tengan acceso a la vía pública. De no ser así se venderían en Puerto Rico infinidad de solares y predios enclavados, lo que daría margen a una multiplicidad de pleitos. Cf. Art. 500 del Código Civil.

En justicia, queremos decir que la posición del Registrador no es descabellada ni absurda, sino que creemos que no es la mejor interpretación ni la que crearía el mejor derecho para esta clase de situaciones. La debilidad de que adolece la posición asumida por el señor Registrador es que éste trató de aplicar a esta situación—una servidumbre legal establecida por el derecho administrativo positivo—los criterios y la doctrina elaborada en torno a las servidumbres tradicionales de origen romano. Ya hemos visto porqué ésto es erróneo. Como señala Valverde al escribir sobre las tendencias de la doctrina civil moderna y sobre el influjo de muchos problemas que tienen su asiento en la legislación civil, dice que "se comprenderá que el derecho civil actual no debe ser un derecho romanizado, sino socializado, para que satisfaga cumplidamente las necesidades que ha de regular en el presente y

131

en el porvenir. (¹⁶) En idéntico sentido es expresa el Presidente del Tribunal Supremo de España, Don José Castán Tobeñas. (¹⁷)

■ Estamos de acuerdo con el señor Registrador en que sería preferible que el asunto hubiese sido aclarado explícitamente mediante acción legislativa para beneficio de todos los Registradores. Son los cuerpos legislativos los que recogen, o deben recoger, las aspiraciones y necesidades de la sociedad que representan y a ellos corresponde plasmarlas en política pública y en normas concretas convirtiéndolas en leyes, pero es necesario tener presente que ante la necesidad de reformas a nuestro derecho civil que pueden tardar décadas o que pueden no venir por la vía legislativa, no podemos permitir que nuestro Código Civil se nos convierta en una ruina por falta de interpretación judicial creadora. (¹⁸)

■ Sin embargo, no le estamos haciendo violencia al articulado del Código Civil ni estamos forzando la interpretación judicial. Estamos actuando dentro de las directrices del propio Código porque, como hemos visto, el Código mismo dispone que en materia de servidumbres legales rigen en primer lugar las leyes y los reglamentos especiales. Es natural que el Código así lo disponga por que dichas servidumbres legales se establecen por ley en interés público y constituyen derecho público y administrativo y no derecho civil propiamente dicho. Por eso escribe Valverde:

"Son muchas las servidumbres legales públicas, las cuales se regirán por disposiciones especiales y en su defecto por el código civil; pero el estudio de tales servidumbres corresponde más bien al derecho administrativo, y por eso no nos hacemos cargo de ellas." Obra citada Tomo II, pág. 369.

(¹⁶) *Tratado de Derecho Civil Español*, 4ta. ed., Tomo I, pág. viii.

(¹⁷) *Derecho Civil Español, Común y Foral*, 10ma. ed., Tomo I, Vol. I, pág. 158. En la 9na. ed., pág. 149.

(¹⁸) Para ilustrar lo difícil que es lograr reformas sistemáticas del Código Civil, véase lo que al efecto escribe Castán en su Tomo I, Vol. I de su *Derecho Civil Español, Común y Foral*, 10ma. ed., pág. 194; 9na. ed., pág. 185.

y Planiol y Ripert expresan:

"Las servidumbres legales de interés público son numerosas. Se derivan casi todas de leyes administrativas. Nos limitaremos a la simple enumeración de tales servidumbres. Su estudio completo tendría demasiados puntos de contacto con el Derecho Público." *Tratado Práctico de Derecho Civil Francés*. Trad. española de Díaz Cruz, (1942) Tomo 3, pág. 752.

Igualmente Borrell y Soler expresa que las servidumbres legales de interés público se rigen en primer lugar por el derecho administrativo y no por el Código Civil.[19] En el mismo sentido se expresa De Diego.[20]

Siendo la servidumbre legal aquí impuesta un derecho real, por ser un gravamen sobre el inmueble y limitativo del derecho de propiedad sobre el mismo, la misma es inscribible porque el Art. 2 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2, y el Art. 27 de su Reglamento, 30 L.P.R.A. sec. 857, no establecen una limitación taxativa de los derechos reales que se pueden inscribir, sino que por el contrario permiten la inscripción de cualquier título o acto, que sin tener nombre propio en derecho, modifica algunas de las facultades del dominio sobre bienes inmuebles o derechos reales. En nuestro derecho positivo prevalece la teoría del *numerus apertus* que admite la posibilidad de crear derechos reales fuera de los previstos por el Código Civil, *Colón* v. *San Patricio Corporation*, supra, pág. 260.[21]

La jurisprudencia que aquí establecemos no es menospreciativa de la alta estima que nos merece nuestro Código Civil. El Código Civil es una de nuestras piezas legislativas más terminadas y uno de los elementos más preciados de nuestro acervo cultural. Para conservarlo tenemos que interpretarlo con imaginación y en forma creadora. Es obvio que el medio

---

[19] Obra citada, Tomo II, pág. 476.

[20] Obra citada, Tomo I, págs. 457-458.

[21] Sobre la naturaleza de derecho real de las servidumbres, V. Puig Brutau, obra citada, pág. 381 y Manresa, obra citada, pág. 626.

social en que vivimos y en el cual opera el Código Civil es muy diferente a aquella sociedad agrícola del ochocientos que produjo dicho Código. Sin embargo, el Código está escrito en lenguaje sencillo y abarcador que permite, dentro de sus márgenes el desarrollo de la jurisprudencia que lo revitaliza y le asegura su permanencia.

Comentando la parquedad del Código al tratar de las servidumbres legales expresa Manresa:

"Realmente, como no es posible traer al Código civil todas las disposiciones taxativas relativas a esta especie de servidumbres, el sistema del Código español, en lo que tiene de indeterminado, es preferible." [22]

Esa forma breve y general con que el Código trata estas instituciones jurídicas es afortunada porque permite "mantener el necesario equilibrio (no estático, sino dinámico) entre el sistema jurídico y los elementos que lo rodean." [23] Esa elasticidad que el Código ha impartido a muchas de las instituciones que comprende, en vez de debilitarlo lo fortalece y le hace posible sobrevivir no empece los radicales cambios del medio social en que opera, pues esos conceptos generales son capaces de asumir, en la unidad de su propia significación, un contenido empíricamente variable. [24] Sólo alabanza merece, ha escrito Castán, el deseo de adaptar las instituciones jurídicas a las exigencias y fines prácticos que están llamadas a servir. [25] Si equivocadamente, en aras del respeto

---

[22] Obra citada, Tomo 4, pág. 735.

[23] V. Del Vecchio, *Los Principios Generales del Derecho*, trad. española de Ossorio Morales, 2da. ed., Barcelona, 1948, pág. 128.

[24] Del Vecchio, obra citada, *ibid.* Un profesor de varias generaciones de abogados puertorriqueños, de acendrada tradición civilista, escribe: "La labor de jurista ha de consistir en interpretar, sin deformarlos ni subvertirlos, los textos, ajustándolos a las necesidades nuevas de la vida." Guaroa Velázquez, *Las Obligaciones Según el Derecho Puertorriqueño*, Equity Publishing Corp., 1964, pág. xiv.

[25] Prólogo del citado autor a *La Propiedad de Casas Por Pisos*, de Batlle (1933), pág. 9; *Castle Enterprises, Inc.* v. *Registrador*, 87 D.P.R. 775 (1963).

al Código, éste fuese interpretado en forma conceptualista pronto se convertiría en obsoleto e inoperante. Eso sería sentenciarlo de muerte, lo cual ciertamente no queremos hacer.

Las incongruencias del legislador, escribe Puig Brutau, sólo han de tomarse como puntos de partida para la interpretación creadora [26] y añade:

"El Derecho, sólo de manera subordinada o meramente instrumental ha de ser considerado, a nuestro juicio, como un engarce lógico de palabras, expresiones y conceptos; en su auténtica realidad consiste en un repertorio de soluciones prácticas para fenómenos reales, para conflictos de intereses que brotan de la convivencia social." [27]

Aun un civilista de enfoque tradicional como el profesor De Castro explica que "la aplicación de las normas supone una actividad creadora en cuanto el que interpreta da sentido, desarrolla y completa la ley." [28]

Ante la antinomia planteada en este caso es nuestro deber, de Tribunal que se confronta con problemas prácticos y concretos de derecho, y no con meras hipótesis o casos imaginativos, crear una solución práctica que haga justicia en el caso particular y que cree la norma más útil socialmente. En otras palabras, es nuestro deber crear un derecho de juristas, según lo llama la doctrina.

Antes de concluir deseamos mencionar que el caso de autos es distinto del caso de *Benet* v. *Registrador,* 65 D.P.R. 489 (1945). Allí un dueño de un solar compró una parte de otro solar colindante y lo agrupó para formar una sola finca. Para inscribir la segregación y la agrupación el comprador y el vendedor acudieron a la Junta de Planificación solicitando el

---

[26] *Fundamentos de Derecho Civil* (1953), Tomo III, pág. 83.

[27] Obra citada, *ibid.* Véase también, para un tratamiento más extenso y documentado del tema su *La Jurisprudencia Como Fuente del Derecho,* págs. 140, 143 y 210; y de Castán, *La Formulación Judicial del Derecho,* 1954, págs. 18–26 y 143–160.

[28] *Derecho Civil de España,* Tomo I, 1ra. ed., pág. 389; 2da. ed., pág. 465.

correspondiente permiso. En su documento de aprobación la Junta hizo la siguiente advertencia:

"Esta Junta no quiere dejar de informar que el Plano Regulador de Vías Públicas Principales para el Area Metropolitana de San Juan ya adoptado por esta Junta, incluye una vía llamada en dicho documento, Carretera Express, Ramal Sur, y que se proyecta por la sección en que radican los solares objeto de esta lotificación. Aun cuando hasta esta fecha no se ha levantado el plano que localiza en forma precisa la servidumbre de paso que será necesaria para dicha vía, esta Junta recomienda que antes de levantarse construcción alguna en los primeros 26 metros de estos solares, o sea entre la actual carretera militar y el fondo de dichos predios, se consulten los estudios o planos sobre el particular."

Basándose en esa advertencia el Registrador inscribió la segregación y agrupación pero hizo constar lo siguiente: "queda dicha finca sujeta a . . . mención de proyectos de servidumbre de paso para una carretera pública aún en estudio por la Junta de Planificación de Puerto Rico." El comprador solicitó la cancelación de esa referencia a la servidumbre de paso, a lo cual, a pesar de la denegatoria del Registrador, nosotros accedimos. Allí concluimos que una mera recomendación de la Junta de que antes de levantarse construcción alguna en esos solares se consultasen los estudios o planos sobre un proyecto de carretera, no autorizaba al Registrador a hacer constar en la inscripción una mención de servidumbre de paso.

Debe ser claro que esa situación no tiene semejanza con la del caso que aquí hemos decidido. Además, nótese que en el citado caso de *Benet* el propietario impugnaba una mención de servidumbre que sin autoridad para ello el Registrador había hecho y en el caso de autos el propietario solicita la inscripción de la servidumbre para llevar a cabo la lotificación. En el primer caso se lesionaba el interés del propietario sin autoridad que lo justificase y en el caso de autos el propietario, en beneficio de su propio interés, y la Junta, en beneficio del

interés público, solicitan la inscripción de la servidumbre legal, lo cual, como hemos explicado, procede.

*Por las razones expuestas en la anterior opinión, se revocará la nota del Registrador y se ordenará practicar las operaciones solicitadas.*